WILLIAM H. HOUSER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Houser v. Commissioner
Docket No. 18937-88
United States Tax Court
T.C. Memo 1995-330; 1995 Tax Ct. Memo LEXIS 326; 70 T.C.M. (CCH) 131; July 24, 1995, Filed *326 Decision will be entered under Rule 155. P is a physician. P's accountant (W) calculated P's medical practice receipts with the understanding that W was to use the subtraction method, as follows: P was to deposit receipts from all sources into an account in A Bank; W then subtracted receipts known to be from other activities and the remainder would be medical practice receipts. P did not deposit all his receipts into the A Bank account. P concedes that, as a result, P's medical practice receipts were substantially understated. The notice of deficiency for 1977 through 1984 was sent to P more than 3 years after he filed his tax returns for 1977 through 1983. 1. Held: The statute of limitations does not bar the assessment and collection of tax for 1977 through 1983. Pars. (1) and (4) of sec. 6501(c), I.R.C. 1954. 2. Held, further, P is liable for additions to tax for civil fraud for 1977 through 1984. Secs. 6653(b) and 6653(b)(1), I.R.C. 1954. 3. Held, further, P is liable for additional additions to tax for 1982 through 1984 based on the portion of the deficiency attributable to fraud; amounts determined. Sec. 6653(b)(2), I.R.C. 1954. 4. Held, further *327 , amounts of deficiencies determined. 5. Held, further, P is liable for additions to tax for substantial understatements of income tax for 1982 through 1984. Sec. 6661(a), I.R.C. 1954. For petitioner: James P. Wersching, Kenneth R. Hughes, [1]David M. Kothman, Robert C. Martin, and William N. Kirkham. For respondent: Ronald T. Jordan. CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6653(b)[2] (fraud) and 6661 (substantial understatement of income tax) against petitioner, as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency [1]
6653(b)
6653(b)(1)
6653(b)(2)
6661
1977
$ 21,942.10
$ 10,971.05
--
--
--
1978
17,318.82
8,659.41
--
--
--
1979
22,322.85
11,161.43
--
--
--
1980
32,110.60
16,055.30
--
--
--
1981
45,888.34
22,944.17
--
--
--
1982 [2]
59,526.16
--
$ 41,993.83
[3]
$ 14,272.65
1983
51,598.86
--
25,799.43
[4]
12,899.72
1984 [2]
32,834.25
--
51,579.63
[4]
8,208.56
*328 By second amendment to answer and by answer to amended petition, respondent asserted increased deficiencies, and corresponding increases in additions to tax, for each year except 1984. The following shows the total deficiencies and additions to tax -- the sums of the amounts determined by respondent in the notice of deficiency, and the amounts asserted by respondent in the second amendment to answer and the answer to amended petition. Additions to Tax Sec. Sec. Sec.
Sec. Year
Deficiency [1]
6653(b)
6653(b)(1) 6653(b)(2)
6661 1977
$ 36,420.94
$ 18,210.47
--    --
--  1978
34,187.82
17,093.91
--    --
--  1979
34,521.85
17,260.93
--    --
--  1980
46,652.60
23,326.30
--    --
--  1981
61,598.41
30,799.21
--    --
--  1982 [2]
75,399.11
--    $ 49,930.31
[3] $ 18,816.00
1983 [4]
55,954.95
--    27,977.48
[3] 13,988.73
1984 [2]
32,834.25
--    51,579.63
[3] 8,208.56
*329 After concessions by both sides, the issues for decision are as follows: (1) Whether the assessment and collection of deficiencies and additions to tax for 1977 through 1983 are barred by the statute of limitations, section 6501(a), or are allowed under the fraud exception, section 6501(c)(1), or the extension agreement exception, section 6501(c)(4), to the general period of limitations. (2) If assessment and collection are not barred for any of the years 1977 through 1983, then, for each such year, and for 1984 -- (a) whether petitioner is liable for civil fraud additions to tax under section 6653(b) (for 1977 through 1981) and under sections 6653(b)(1) and 6653(b)(2) (for 1982 through 1984) and, as to section 6653(b)(2), in what amount; (b) what is the amount of petitioner's unreported gross income; and (c) whether petitioner is liable for additions to tax for 1982 through 1984 under section 6661 for a substantial understatement of income tax. FINDINGS OF FACT [3]
*330 Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner resided in Cincinnati, Ohio. Background
Petitioner was born in 1927 and grew up during the Depression, primarily in Anderson, Indiana. Petitioner attended college at Indiana University and at Ball State University, where he received a bachelor of science degree. Petitioner then attended the Chicago College of Osteopathy, where he received a degree in 1956. After graduation, petitioner interned at Doctor's Hospital in Columbus, Ohio, where he developed a specialty in anesthesiology. Starting in 1957, petitioner did a 2-year residency at Doctor's Hospital. In 1959, petitioner began practicing at Epp Memorial Hospital in Cincinnati, Ohio. Petitioner began working with Williard Weiss (hereinafter sometimes referred to as Weiss), a certified public accountant, in or about 1960. Weiss was petitioner's investment counselor and accountant. Initially, petitioner was a once-a-year client of Weiss. That is, Weiss prepared petitioner's tax returns from figures that petitioner supplied to Weiss. After *331 about 1969, Weiss began to provide more comprehensive accounting services to petitioner. In particular, Weiss prepared petitioner's tax returns for 1977 through 1984 and interim income and expense statements for a period that includes 1977 through 1980. Petitioner and Weiss also were friends. Petitioner and Weiss discussed one another's investments and shared information on investments. In or about 1961 or 1962, petitioner opened a general medical practice at his residence in Deer Park (hereinafter sometimes referred to as the Deer Park office). [4] Petitioner's primary medical practice income at that time was from his anesthesiology work at Epp Memorial Hospital; he had few patients in his general medical practice at the Deer Park office. In or about 1968, Weiss introduced petitioner to Sherwood Chamberlain (hereinafter sometimes referred to as Chamberlain), a medical doctor for whom Weiss also *332 performed accounting services. Chamberlain had been in practice in an office in North College Hill (hereinafter sometimes referred to as the North College Hill office) [5] since about 1935. Chamberlain told Weiss that he (Chamberlain) wanted to leave the practice of medicine because of concerns about his health.
Petitioner started practicing with Chamberlain at the North College Hill office in or about 1968. Under an agreement with Chamberlain, petitioner bought Chamberlain's North College Hill office practice in early 1969, making monthly payments to Chamberlain, working with Chamberlain, and splitting the profits with Chamberlain until 1974, when petitioner took over the entire North College Hill office practice and profits. During the years in issue, petitioner's principal occupation was that of medical doctor, and the North College Hill office was petitioner's principal business office. *333 Petitioner saw patients at the Deer Park office only on Tuesdays. The Deer Park Office
Donna Zink (hereinafter sometimes referred to as Zink) worked for petitioner, mostly at the Deer Park office, from 1966 to 1985. In this employment, Zink prepared calendars for the periods November 15, 1982, through August 9, 1983; and January 10, 1984, through December 20, 1984. The calendars show the names of the patients seen by petitioner on Tuesdays and the amount each patient paid for petitioner's services. The calendars also show for each day the names of the diet patients whom Zink saw on Mondays, Wednesdays, and Thursdays, and those patients' payments. (It is not clear whether Zink also saw diet patients on Tuesdays.) Zink began to see the diet patients on Mondays, Wednesdays, and Thursdays in the late 1970's. Petitioner and Zink saw about 255 different patients in the Deer Park office during the 21 months covered by the calendars. Of these patients, 174 were seen during 1984. Fifty-one of the 174 patients seen during 1984 also had been seen during the 1 1/2-month period covered by the 1982 calendar. Before November 15, 1982, Zink accounted for patient receipts by noting payments *334 directly on individual patients' medical records; no calendar summary of patients' payments was kept. The only way to account directly for receipts from Deer Park office patients before November 15, 1982, was by reference to the individual patient medical records. On a daily basis, Zink stamped the backs of the checks received in the Deer Park office "for deposit only" to the Anderson Bank, in Anderson, Indiana, and placed the checks and any currency received in a drawer. Zink did not prepare bank deposit slips. During the periods covered by the calendars, petitioner's medical practice receipts in the Deer Park office were in the amounts shown in table 1. Table 1 Period
Amount Nov. 15-Dec. 30, 1982
$  2,685.00
Jan. 3-Aug. 9, 1983
15,205.50
Jan. 10-Dec. 20, 1984
22,171.73
During the years in issue, petitioner's medical practice receipts in the Deer Park office were in at least the amounts shown in table 2. Table 2 Year
Amount 1977
$ 11,000.00
1978
12,000.00
1979
14,000.00
1980
15,000.00
1981
17,000.00
1982
20,000.00
1983
22,000.00
1984
22,171.73
The North College Hill Office
When petitioner bought Chamberlain's practice at the North College *335 Hill office, a bookkeeping system was already in place; Weiss had set it up. Under this bookkeeping system, maintained by one or more of the employees, patient payments made in person (whether by currency or check) were recorded on individual cards kept for each patient. At the end of the day, or the next morning, the patients' names and corresponding payment amounts were entered onto daily cash receipts journals (hereinafter sometimes referred to as day sheets). [6]
Oakley Wardlow (hereinafter sometimes referred to as Wardlow) worked for Chamberlain and later for petitioner at the North College Hill office from about 1960 to about 1982. In her employment for Chamberlain, Wardlow was one of those responsible for maintaining the day sheets. Wardlow recorded patient payments made in person (whether by currency or check) on individual cards kept for each patient. At the *336 end of the day, or the next morning, she entered the patients' names and corresponding payment amounts onto the day sheets. At the end of each day, Wardlow, or one of her colleagues, counted the currency and checks, and deposited them in a bank, using a night deposit system. Payments also were received at the North College Hill office through the mail from, for example, insurance companies or patients making payments on account. Wardlow or one of her colleagues opened the mail. When a check was received as payment of a medical practice bill, the payment was marked on the patient's card, the check was included with the checks and currency received in person that day, and the amount of the check later was entered onto the day sheets. After petitioner took over the North College Hill office, the procedure continued to be that patient payments made in person (whether by currency or check) were recorded on individual cards kept for each patient. The next morning, that same information was entered onto the day sheets. The checks received from patients in person were stamped for deposit to the Anderson Bank. At the end of each day, the currency and checks collected that day were put into *337 an envelope. The next morning, the currency and checks were counted, and an Anderson Bank deposit slip was filled out. The currency, checks, and deposit slip then were put into an envelope, and the envelope was given to petitioner. Clara Baumgartner (hereinafter sometimes referred to as Baumgartner) and Patricia Ashburn (hereinafter sometimes referred to as Ashburn) worked for petitioner in the North College Hill office. Baumgartner worked at the North College Hill office from 1978 to 1980 and again from 1983 to 1985; Ashburn worked at that office from January 1980 to June 1983. Both Baumgartner and Ashburn were responsible for maintaining the day sheets. Unlike the procedure followed in the North College Hill office under the direction of Chamberlain, Baumgartner and Ashburn did not open mail coming into the office. Each day's mail was placed on petitioner's desk. On a few occasions, Baumgartner was given checks for small amounts that had arrived in the mail; she processed these checks the same way she processed checks received from patients in person. Neither Baumgartner nor Ashburn was given checks that came into the North College Hill office from insurance companies or the Ohio *338 Bureau of Workers' Compensation. Payments received through the mail generally were not entered onto the day sheets. Petitioner received checks through the mail from the Ohio Bureau of Workers' Compensation in the amounts shown in table 3. Table 3 Year
Amount
1977
$  5,759
1978
10,530
1979
1,190
1980
5,778
1981
7,624
1982
11,223
1983
11,393
1984
10,193
Janet Greico (hereinafter sometimes referred to as Greico) was the office manager at the North College Hill office from 1971 to 1980 and again from 1983 to 1986 or 1987. Among other duties, Greico was responsible for overseeing the North College Hill office's bookkeeping. Greico obtained the checks that petitioner received from the Ohio Bureau of Workers' Compensation; she recorded the information on the appropriate patients' cards and stamped the checks for deposit to the Anderson Bank. The Ohio Bureau of Workers' Compensation checks were not included in the Anderson Bank deposit slips that Baumgartner and Ashburn prepared. Neither the Ohio Bureau of Workers' Compensation checks nor the Deer Park office receipts were included in the day sheets. In addition to maintaining the day sheets, Baumgartner and Ashburn *339 were responsible for compiling information from the day sheets and recording that information on monthly medical practice receipts summary sheets (hereinafter sometimes referred to as monthly summaries). Other Investments and Assets
During the years in issue, petitioner received income from investments in real estate. Petitioner owned rental properties -- a post office building that petitioner had built to specifications of the U.S. Postal Service, and at least five one-family residences -- and paid the expenses associated with these properties. Lessees usually paid their monthly rent by mailing checks to petitioner at the Deer Park office address. Petitioner also received Forms 1099 from the Federal Government showing payments for lease of the post office building. Petitioner earned farming income from several different properties pursuant to sharecropping arrangements. Under these arrangements, petitioner, as lessor, supplied the land, seed, weed killer, nitrogen, and some of the equipment; the lessee furnished farming equipment and labor, and took the products to market. Petitioner received payments at the Deer Park office for the sales of farm products. On a routine basis, *340 petitioner provided to Weiss the invoices received from farm cooperatives, showing petitioner's receipts from the sales of farm commodities. Petitioner had investments in Florida citrus groves, oil leases, U.S. Treasury notes, certificates of deposit, stocks, and jewelry. Petitioner received a report each year for tax purposes on the financial status of the Florida citrus groves and forwarded those reports to Weiss. Petitioner opened a bank account in Florida, at the Ellis Bank and Trust Co., into which he deposited the proceeds from the citrus grove investments. Both Weiss and petitioner invested in oil leases with the help of Weiss' brother. Weiss advised petitioner to invest in U.S. Treasury notes and certificates of deposit. Petitioner and Weiss often discussed their stock investments with each other, and used the same broker. Petitioner bought jewelry, both men's and women's, as investments over a period of about 30 years. Petitioner also claims to have had an investment in a Mexican silver mine. Petitioner claims to have obtained his interest in the Mexican silver mine by transferring jewelry to Sam Mercurio and William DiGiore (hereinafter sometimes referred to as DiGiore). *341 As evidence of this transaction, petitioner received a promissory note from DiGiore. Additional Income in 1981-1983
In 1981, petitioner received $ 226 interest income from the Ellis Bank and Trust Co.; this is in addition to the $ 95 interest income from this bank that he reported on his 1981 tax return. On his 1981 and 1982 tax returns, petitioner deducted Keogh (H.R. 10) plan contributions in the amounts of $ 3,832 and $ 15,000, respectively. He should have deducted $ 7,500 for 1981 and $ 11,332 for 1982. In 1982, petitioner received a State income tax refund, $ 300 of which he previously had deducted. (In the notice of deficiency, respondent determined the amount was $ 363, but respondent conceded $ 63 of this amount before trial.) The $ 300 refund was not reported on his 1982 tax return. Tax Returns
Petitioner timely filed his tax returns for 1977 through 1981. Petitioner also timely filed his tax return for 1983, on or just before October 15, 1984. See sec. 7502(a)(1). Petitioner received extensions of time to file his tax returns for 1982 and 1984. Petitioner filed his tax returns for 1982 and 1984 after the expiration of the extensions of time for filing those *342 tax returns -- his 1982 tax return on October 17, 1983, and his 1984 tax return on November 12, 1985. The parties executed agreements to extend the period of limitations for 1982 and 1983. The agreement for 1982 is a Form 872-A; it was signed by petitioner on September 12, 1986, and on behalf of respondent on September 22, 1986. The Form 872-A extended the 1982 tax return period of limitations indefinitely. The agreement for 1983 is a Form 872; it was signed by petitioner on June 29, 1987, and on behalf of respondent on July 7, 1987. The Form 872 extended the 1983 tax return period of limitations until June 30, 1988. Respondent issued the notice of deficiency on April 20, 1988, more than 3 years after the 1977 through 1983 tax returns had been filed, but before the expiration of the extended limitation periods for 1982 and 1983. The notice of deficiency was filed within 3 years of the date the 1984 tax return was filed. While Chamberlain was still in the North College Hill office, Weiss went there to work on the business' books and records. Weiss prepared a general ledger from the day sheets, and prepared Chamberlain's tax returns from the general ledgers. After Chamberlain left, *343 petitioner met with Weiss about once a month to give to Weiss financial information on petitioner's medical practice and other investments and assets. These meetings were at the Deer Park office, because that location was convenient for Weiss. Weiss no longer went to the North College Hill office. These meetings generally were on Tuesdays, because petitioner usually was in his Deer Park office on Tuesdays. During these meetings, petitioner gave to Weiss bank statements and bank stubs from the Anderson Bank, check vouchers from the Ohio Bureau of Workers' Compensation, agriculture receipts information, rental receipts information, records of interest and dividend income, and information on interest expense and other expenses. Petitioner did not give the monthly summaries to Weiss. Petitioner marked any deposits he considered to be extraordinary on the bank statements from the Anderson Bank, so that Weiss would know that those items were to be accounted for separately. See infra table 6. At the meetings, petitioner and Weiss discussed some of the deposits. For at least the 4 years 1977-1980, Weiss prepared monthly year-to-date income and expenses statements that petitioner received. *344 Table 4 shows the final such statement for 1979. Table 4 Receipts, Professional Fees & Investment Income
$ 259,086.81
Expenses:
Office salaries
$ 26,745.32
Telephone & utilities
3,381.31
Laundry
281.67
Taxes, office
7,270.92
Insurance
5,556.24
Professional assistance
32.00
Entertainment & promotion
-   Dues & subscriptions
784.50
Auto expense
674.86
Office maintenance
1,158.12
Laboratory & hospital
154.00
Postage
330.08
Office esupply [sic] & expense
921.51
Medical supply
45,331.55
Medical convention [sic]
760.76
Miscellaneous
425.36
Legal & accounting
1,320.00
Pension Plan
10,152.83
Office depreciation, est.
4,800.00
Farm depreciation, est.
15,600.00
Farm expense & taxes
51,050.23
Farm interest, est.
24,000.00
Total Expense
200,731.26
Net Profit
58,355.55
On his 1979 tax return, petitioner reported gross receipts as shown in table 5. Table 5 Category Amount Interest
$ 3,444
Dividends [1]
3,095
Medical practice
197,567
Capital gain [2]
1,496
Rents
12,367
Farm
41,118
Gross receipts
259,087
*345 During the years in issue, Weiss prepared petitioner's tax returns with the understanding that petitioner deposited all receipts from whatever source into a bank account at the Anderson Bank, except that petitioner told Weiss about keeping at least some of petitioner's securities receipts in his stock brokerage account. The record is not clear as to whether petitioner told Weiss about any other instances where petitioner had receipts that he did not deposit into the Anderson Bank account. Weiss calculated petitioner's gross receipts from his medical practice, as follows: Weiss totaled all deposits to the Anderson Bank, then subtracted known receipts from other sources (rental income, farm income, etc.), to arrive at total medical practice receipts. This was referred to as "the subtraction method". Table 6 shows, for example, how Weiss determined petitioner's medical practice receipts for 1982. Table 6 Total deposits to Anderson Bank account
$ 293,872.53 Less: Interest earned on Anderson Bank account
(2,293.05)
Anderson Bank correction of deposit
(70.00)
Net deposits
291,509.48 Less adjustments: Deposit error
(2.00)
Patient refund
(20.00)
Bad checks returned
(3,859.66)
Total income receipts
287,627.82 Rent received
$  17,621    Farm sales
80,012    Dividends paid in cash
2,397    Interest paid in cash
5,318    Professional fees [medical practice receipts]
182,280    287,628    *346 Weiss showed this example to respondent's agent, to illustrate how Weiss used the subtraction method to prepare petitioner's tax returns. Petitioner did not deposit all his taxable receipts into the Anderson Bank account. Some of his rental receipt checks were cashed, some were endorsed to others to pay loans and expenses, and some were deposited into Ellis Bank and Trust Co. Some of his farm receipts were applied to loans. Petitioner kept a cash hoard in his residence; on August 28, 1985, it amounted to more than $ 98,000. Houser I, 96 T.C. at 190-192. This cash hoard was accumulated from his medical practice and farm receipts. Petitioner ordinarily kept a cash hoard of about this amount in his residence. Petitioner did not tell Weiss about most of his failures to deposit taxable receipts into the Anderson Bank account. Using the subtraction method for petitioner's 1984 tax return, Weiss came up with a negative figure for medical practice receipts. In an attempt to file the 1984 tax return in a timely manner, Weiss and petitioner agreed to set forth an amount about 20 percent higher than the previous year for medical practice receipts and mark the tax *347 return "tentative". As previously noted, the 1984 tax return was filed late. For 1983, petitioner reported $ 238,999 medical practice receipts. For 1984, petitioner reported the medical practice receipts as "Estimated 280,000". On his tax returns for 1977 through 1984, petitioner reported adjusted gross income, taxable (or tax table) income, and tax liability (including self-employment tax liability) as shown in table 7. Table 7 Adjusted
Taxable (or Tax
Year
Gross Income
Table) Income
Tax Liability
1977
$  47,767
$  47,420
$ 17,533
1978
70,755
69,713
27,740
1979
51,624
49,878
18,909
1980
26,633
22,029
6,360
1981
41,877
28,217
9,716
1982
68,682
61,281
24,411
1983
43,409
23,381
6,706
1984
166,068
161,582
70,325
On his tax returns, petitioner reported medical practice receipts, medical practice deductions, and medical practice net profits as shown in table 8. Table 8 Reported Reported Reported Medical
Medical
Medical
Practice Practice Practice Year
Receipts Deductions
Net Profits
1977
$ 182,208
$  89,155
$  93,053
1978
197,696
94,931
102,765
1979
197,567
107,602
89,965
1980
169,499
109,802
59,697
1981
153,233
127,688
25,545
1982
182,280
76,286
105,994
1983
238,999
118,732
120,267
1984
280,000
139,057
140,943
*348 Petitioner had medical practice receipts in the years, the categories, and at least the amounts shown in table 9. Table 9 Total Day Sheets
Ohio
Calendars, Medical (North
Bureau of Etc. Practice
Year
College Hill) Workers' Comp.
(Deer Park)
Receipts
1977
$ 226,200.20
$  5,759
$ 11,000.00
$ 242,959.20
1978
232,445.38
10,530
12,000.00
254,975.38
1979
242,367.44
1,190
14,000.00
257,557.44
1980
235,608.94
5,778
15,000.00
256,386.94
1981
243,077.69
7,624
17,000.00
267,701.69
1982
283,887.16
11,223
20,000.00
315,110.16
1983
315,701.22
11,393
22,000.00
349,094.22
1984
310,219.47
10,193
22,171.73
342,584.20
Table 10 shows the amounts of medical practice receipts petitioner omitted to report, by comparing the amounts of medical practice receipts that petitioner reported on his tax returns (supra table 8) with the amounts he actually received (supra table 9, rounded to nearest dollar). Table 10 Medical Practice Receipts Year
Reported
Actual
Omitted
1977
$ 182,208
$ 242,959
$  60,751
1978
197,696
254,975
57,279
1979
197,567
257,557
59,990
1980
169,499
256,387
86,888
1981
153,233
267,702
114,469
1982
182,280
315,110
132,830
1983
238,999
349,094
110,095
1984
280,000
342,584
[1] 62,584
*349 Table 11 shows the amounts of medical practice receipts petitioner omitted to report (supra table 10) as a percentage of the amounts of medical practice net profits that petitioner reported on his tax returns (supra table 8). Table 11 Reported Omitted
Medical
Medical
Omitted Receipts
Practice Practice as Percent of Year
Net Profits
Receipts Reported Net Profits
1977
$  93,053
$  60,751
65.3
1978
102,765
57,279
55.7
1979
89,965
59,990
66.7
1980
59,697
86,888
145.5
1981
25,545
114,469
448.1
1982
105,994
132,830
125.3
1983
120,267
110,095
91.5
1984
140,943
62,584
44.4
Total
738,229
684,886
92.8
Table 12 shows the amounts of medical practice receipts petitioner omitted to report (supra table 10) as a percentage of the amounts of taxable (or tax table) income that petitioner reported on his tax returns (supra table 7). Table 12 Omitted
Omitted Receipts as
Reported Taxable
Medical
Percent of Reported
(or Tax Table)
Practice Taxable (or Tax
Year
Income
Receipts Table) Income
1977
$  47,420
$  60,751
128.1
1978
69,713
57,279
82.2
1979
49,878
59,990
120.3
1980
22,029
86,888
394.4
1981
28,217
114,469
405.7
1982
61,281
132,830
216.8
1983
23,381
110,095
470.9
1984
161,582
62,584
38.7
Total
463,501
684,886
147.8
*350 Miscellaneous Adjustments
On his 1982 tax return, petitioner reported interest income as shown in table 13. Table 13 Ordinary interest income from --
Anderson Banking
$ 3,880
Ellis Bank & Trust Co.
311
Deer Park Fed. S & L
14
Mt. Washington S & L
113
4,318
All-Savers Certificates (ASCs)
Anderson Banking
$ 1,000
ASC exclusion
1,000
-0- Total
4,318
In the notice of deficiency, respondent determined as follows: A 3) During the taxable year 1982, you realized income in the amount of $ 9,012.00 from interest, as detailed below which was not reported on your income tax return. Accordingly, taxable income is increased $ 9,012.00 for the taxable year ended December 31, 1972 [sic]. Treasury Notes
$ 10,012.00 Anderson Banking Company (all savers)
[7] (1,000.00)
$  9,012.00 *351 On his 1982 tax return, petitioner deducted $ 45,927 for medicines and drugs as an expense of his medical practice. In the notice of deficiency, respondent determined that petitioner had substantiated $ 45,993, but this amount must be reduced because (1) it included a $ 157 personal payment and (2) petitioner had received rebates worth $ 1,413. As a result, respondent determined that petitioner's taxable income should be increased by $ 1,504. [8]
On his 1982 tax return, petitioner also deducted $ 4,100 for 25,000 miles of automobile transportation as an expense of his medical practice. In the notice of deficiency, respondent determined that petitioner was entitled to deduct $ 3,763.84 for 21,944 miles. As a result, respondent determined that petitioner's taxable income should be increased by $ 336.16. *352 On his 1983 tax return, petitioner reported $ 709 interest income from "U.S. Treasury notes". In the notice of deficiency, respondent determined that petitioner had received $ 7,548 from "Treasury notes", and had failed to report $ 6,839 of this amount. Petitioner did not give the monthly summaries, day sheets, or calendars to Weiss, his tax return preparer. For each of the years 1977 through 1984, petitioner omitted to report a substantial amount of income; the amounts are not less than those shown in the right-hand column of table 10, supra. These omissions resulted in underpayments of income tax required to be shown on petitioner's tax returns for each of these years. These omissions resulted from petitioner's intentional misleading of Weiss, his tax return preparer. Petitioner was aware of these omissions. For each of the years 1977 through 1984, petitioner had an underpayment of income tax required to be shown on his tax return; some part of the underpayment for each of these years was due to petitioner's fraud. OPINION I. Statute of Limitations
Petitioner has properly raised in his amended petition the affirmative defense of the statute of limitations under section *353 6501(a). Rule 39. In general, section 6501[9] bars assessment of an income tax deficiency more than 3 years after the later of (1) the date the tax return was filed or (2) the due date of the tax return. If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the later of the filing or the due date, then the respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069, 1075-1076 (1928); see Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); see also Minahan v. Commissioner, 88 T.C. 492, 506 (1987). *354 In the instant case, we have found that the tax returns for 1977 through 1983 were filed more than 3 years before the notice of deficiency was issued and that the tax return for 1984 was filed less than 3 years before the notice of deficiency was issued. Thus, the statute of limitations is in issue only for 1977 through 1983. Respondent contends that the instant case falls within the exception to the general period of limitations set forth in section 6501(c)(1), [10] *355 which provides that if a false or fraudulent return is filed with the intent to evade tax, then the tax may be assessed at any time. In the alternative, respondent contends that for 1982 and 1983, the instant case falls within the exception to the general period of limitations set forth in section 6501(c)(4), which provides that if, before the expiration of the time to assess the tax, the parties consent in writing to extend the time for the assessment of the tax, then the tax may be assessed at any time before the end of the period agreed on. [11]
*356 Petitioner contends that (1) respondent has failed to prove fraud by clear and convincing evidence for any of the years in issue and (2) respondent has failed to present "any additional evidence which would serve to otherwise extend the three-year statute of limitations on assessments". We agree with respondent. A. Fraud Exception
Respondent has the burden of proving the applicability of the fraud exception to the general period of limitations. Farmers Feed Co. v. Commissioner, 10 B.T.A. at 1075-1076. This burden is the same as that which respondent has under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). To carry this burden for a year, respondent must prove two elements, as follows: (1) That petitioner has an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud. Sec. 7454(a); [12] Rule 142(b); e.g., Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959); *357 Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105, 114 (1969). Each of these elements must be proven by clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); *358 Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. In carrying this burden, respondent may not rely on petitioner's failure to meet his burden of proving error in respondent's determinations as to the deficiencies. E.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases cited therein. Where fraud is determined for each of several years, the respondent's burden applies separately for each of the years. Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954; Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), *359 affg. T.C. Memos. 1970-144 and 1970-37; Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100; Otsuki v. Commissioner, 53 T.C. at 108. The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224. In order to establish fraud, respondent must show that petitioner intended to evade taxes, which petitioner knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), *360 affd. 519 F.2d 1121 (5th Cir. 1975). This intent may be inferred from circumstantial evidence, Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of petitioner's explanations, Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951. (1) Underpayments of Tax
In order to determine whether there were any underpayments of tax, we first determine whether petitioner had unreported income for 1977 through 1984. [13] *361 Respondent alleges fraud only with respect to petitioner's medical practice receipts for each of these years. [14] Thus, we limit ourselves in this part to a discussion of the medical practice receipts. *362 In the notice of deficiency, respondent determined that petitioner had unreported medical practice receipts, based on three sources of information, as follows: (1) The day sheets for 1977 through 1984 kept at the North College Hill office, (2) the calendars for 1982 through 1984 kept at the Deer Park office, and (3) check vouchers for 1983 and 1984 from the Ohio Bureau of Workers' Compensation. In the second amendment to answer and the answer to amended petition, respondent asserted that petitioner had additional unreported medical practice receipts for 1977 through 1983 based on an extrapolation of figures on the calendars from the Deer Park office, and for 1977 through 1982 based on Ohio Bureau of Workers' Compensation check vouchers, respectively. Petitioner concedes "that there was a substantial understatement of the medical practice income", resulting from the method that Weiss used to calculate that income, but does not "concede the exact amounts of those understatements." Petitioner does not suggest that the day sheets overstate his medical practice receipts from the North College Hill office. The same is true regarding the calendars from the Deer Park office. The parties *363 have stipulated the amounts of petitioner's receipts from the Ohio Bureau of Workers' Compensation. In addition, it is clear (and we have found) that petitioner had medical practice receipts from the Deer Park office for time periods not covered by the calendars -- the period before November 15, 1982, and the 5-month period after August 3, 1983, and before January 10, 1984. See supra table 2. We conclude that petitioner had unreported medical practice income for 1977 through 1984 in the amounts set forth in the right-hand column of table 10, supra. Petitioner does not suggest that he is entitled to offsetting deductions or credits for any of those years. Thus, we conclude that respondent has shown by clear and convincing evidence that petitioner had an underpayment of tax for each of the years 1977 through 1984. We hold for respondent on this issue. (2) Fraudulent Intent[15]
*364 The factors discussed infra lead us to conclude that some part of the underpayment of tax for each of the years 1977 through 1984 was due to petitioner's fraud. Our conclusion is based on the following factors: (a) The substantial omissions from income each year for 8 consecutive years, (b) petitioner's misleading of his tax return preparer, and (c) evidence that causes us to conclude that petitioner knew that his medical practice receipts were substantially greater than what he reported on his tax returns. We reject petitioner's contention (d) that the omissions from income were a result of petitioner's misunderstanding. (a) Pattern of Omissions. -- Petitioner's understatements of his medical practice receipts were substantial in each of the 8 years in issue. These understatements averaged just over $ 85,000 per year, more than 90 percent of petitioner's reported medical practice income (supra table 11) and almost 150 percent of petitioner's reported taxable, or tax table, income (supra table 12). This pattern is important because it demonstrates that the understatements were not the result of a temporary error, or a passing inadvertence. This pattern of substantial *365 omissions from income for 8 consecutive years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d at 202; Adler v. Commissioner, 422 F.2d at 66; Otsuki v. Commissioner, 53 T.C. at 108. (b) Misleading of Tax Return Preparer. -- Most, if not all, of the understatement of medical practice receipts for each of the years in issue results from the difference between (1) Weiss' understanding of what petitioner was doing with his taxable receipts and (2) what petitioner actually was doing with his taxable receipts. Under Weiss' subtraction method, all of petitioner's taxable receipts were to be deposited into petitioner's Anderson Bank account. When all other sources of receipts (e.g., rentals, farm receipts, U.S. Treasury note interest) were identified and subtracted from total receipts, then what remained must be medical practice receipts. This process is illustrated by table 6, supra, which is drawn from a document that Weiss gave to respondent's agent to show the agent how Weiss arrived at the $ 182,280 medical practice receipts amount that appears on petitioner's *366 1982 tax return. However, petitioner did not deposit all his taxable receipts into the Anderson Bank account. Under Weiss' subtraction method, the undeposited receipts resulted in understatements of petitioner's medical practice receipts, and that in turn resulted in underpayments of petitioner's income (or self-employment) taxes. In fact, we have concluded that petitioner's 1982 medical practice receipts were at least $ 315,110.16, not the $ 182,280 that Weiss calculated and that petitioner reported. See supra tables 8 and 9. So much is clear. The essential disputed question, then, is whether respondent has shown by clear and convincing evidence that for each year petitioner understood and intended that at least some part of this underpayment was occurring. Petitioner contends that he did not understand Weiss' subtraction method or the consequences of his (petitioner's) failure to deposit all his taxable receipts into the Anderson Bank account. Petitioner contends that he provided to Weiss all the materials he (petitioner) understood that Weiss needed in order to correctly prepare petitioner's tax returns. We do not believe these contentions. Petitioner testified that, at his *367 monthly meetings with Weiss at the Deer Park office, petitioner gave to Weiss bank statements and bank stubs from the Anderson Bank, check vouchers from the Ohio Bureau of Workers' Compensation, agriculture receipts information, rental receipts information, records of interest and dividend income, and information on interest expense and other expenses. This testimony is corroborated by Weiss and also makes sense in terms of Weiss' use of the substraction method. Petitioner also testified that he gave to Weiss income "figures on the Deer Park office". Petitioner testified that, any time he failed to show to Weiss records of medical practice receipts relating to the Deer Park office, Weiss "would ask where are the Deer Park [sic]. So I'd show it to him and he'd tabulate or put it down on his notes." However, in the Deer Park office the calendars did not begin to be prepared until November 15, 1982. Before that date, the only record of Deer Park office patient receipts was on the individual patients' medical records. Thus, for most of the 8-year period before the Court, the only way that Weiss could have gotten information as to Deer Park office receipts was to laboriously go through *368 the individual patients' medical records and extract from each of them the information about the payments made since Weiss' previous visit. The record does not indicate how many active patient medical files petitioner had at any one time at the Deer Park office, but the information we have been able to extract from the 21 months covered by the calendars makes it clear that petitioner had well over 200 active files at the Deer Park office around that time. We believe that Weiss did not examine hundreds of patients' medical files on his monthly visits to the Deer Park office. Petitioner was not specific, and was evasive, as to what records he gave to Weiss that would show directly the amounts of his medical practice receipts from the Deer Park office. [16] We conclude that this evasiveness and lack of specificity result from the fact that petitioner did not give any such medical practice receipts records to Weiss. This leads us to conclude that petitioner indeed understood that Weiss could not directly determine petitioner's Deer Park office medical practice receipts from the information that petitioner gave to Weiss. Thus, petitioner's explanation begins to unravel. *369 There is a somewhat similar problem regarding the North College Hill office medical practice receipts records. Petitioner testified that he gave to Weiss the North College Hill monthly summaries. The day sheets had been prepared at the North College Hill office since the time Chamberlain was the sole owner of that practice. In those days, Weiss came to that office and worked with the day sheets. It is not clear from the record whether Weiss saw monthly summaries or worked with them in those days. The bulk of the testimony about the monthly summaries comes from Baumgartner and Ashburn, who worked at the North College Hill office for petitioner for overlapping periods from 1978 to 1985. Petitioner told them that the monthly summaries were prepared for Weiss' use, but they did not know whether the monthly summaries actually got to Weiss. Greico testified that she spoke with Weiss over the telephone about monthly summaries on some occasions. But Greico dates back to 1971 at the North College Hill office, while Chamberlain still was there, and she did not indicate when these conversations with Weiss took place. Weiss testified, [17] at several points, that he would not have had any occasion *370 to see the monthly summaries. The record shows that Weiss prepared monthly year-to-date income and expense statements for petitioner. See, e.g., supra table 4. Although the expense categories are broken out in great detail, and appear to separate out farm expenses from medical practice expenses, the receipts are shown as one lump sum. This is so even though the receipts have to be broken out into six categories for tax return purposes. See, e.g., supra table 5. The foregoing is consistent with Weiss' description of what happened at his meetings with petitioner -- that they discussed *371 expenses in detail, that petitioner provided to Weiss information as to gross receipts by way of deposits to the Anderson Bank, that petitioner provided to Weiss information about receipts from sources other than petitioner's medical practice, and that petitioner did not provide to Weiss any significant direct information about petitioner's North College Hill medical practice receipts. If petitioner had been giving the monthly summaries, or the day sheets, to Weiss, then Weiss quickly would have discovered that there was a problem. For example, table 6, supra, shows that Weiss thought that petitioner's 1982 receipts from all sources were $ 287,628, more than $ 105,000 of which was from sources other than medical practice receipts, and only $ 182,280 of which was medical practice receipts. But the day sheets (supra table 9) show that petitioner's North College Hill office alone produced medical practice receipts of $ 283,887. We believe that, if petitioner really had given either the monthly summaries or the day sheets to Weiss, then Weiss would have realized that more than $ 100,000 was missing from the North College Hill medical practice receipts records alone. The 1979 *372 figures are less dramatic, but they make the same point. Tables 4 and 5, supra, show that Weiss thought that petitioner's 1979 receipts from all sources were $ 259,087, more than $ 60,000 of which was from sources other than medical practice receipts, and only $ 197,567 of which was medical practice receipts. But the day sheets (supra table 9) show that petitioner's North College Hill office alone produced medical practice receipts of $ 242,367. We believe that, if petitioner really had given either the monthly summaries or the day sheets to Weiss, then Weiss would have realized that almost $ 45,000 was missing from the North College Hill medical practice receipts records alone. In fact, as can be seen by comparing table 8 with table 9, supra, the day sheets amounts alone exceed the total reported medical practice receipts by a significant amount for every one of the years in issue. If Weiss had regularly received the monthly summaries, then surely Weiss would have noticed this discrepancy. This leads us to conclude that petitioner did not give the monthly summaries to Weiss. We do not believe that petitioner provided to Weiss any information about petitioner's medical *373 practice receipts, either from the Deer Park office or the North College Hill office, except the information that Weiss derived from the Anderson Bank deposits and the subtraction method. At this point, petitioner's explanation, that there was an innocent error, has completely unraveled. Petitioner's implausible explanation, which we reject, is itself an indication of fraud. Boyett v. Commissioner, 204 F.2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951. Petitioner was a businessman who took the trouble to build a post office to U.S. Postal Service specifications so that he could get rental income, and owned and leased at least five one-family residences. Petitioner earned farming income from several different properties. Petitioner had investments in Florida citrus groves, oil leases, U.S. Treasury notes, stocks, jewelry, and a Mexican silver mine. Petitioner ran a thriving medical practice without any partners for many years. We conclude that petitioner had enough business sophistication to understand that he was not providing to Weiss any information from which Weiss could determine directly petitioner's medical *374 practice receipts. We conclude that petitioner understood that, given the information that Weiss had, Weiss could calculate petitioner's medical practice receipts only by the subtraction method. We conclude that petitioner understood that his failure to deposit hundreds of thousands of dollars of taxable receipts into the Anderson Bank would mislead Weiss into thinking that petitioner's medical practice receipts were less than they actually were. See supra tables 11 and 12. The magnitude and long pattern of petitioner's failures to make these deposits makes it clear that these failures were not due to occasional oversights, but instead resulted from petitioner's intention to mislead Weiss and cause Weiss to understate petitioner's medical practice receipts, which resulted in Weiss' understating petitioner's medical practice net income, which in turn resulted in Weiss understating petitioner's taxable (or tax table) income, and which finally resulted in Weiss' understating petitioner's income tax liability. Petitioner's misleading of his tax return preparer in a way that would reduce petitioner's reported tax liability is further evidence of fraud. Farber v. Commissioner, 43 T.C. 407, 420 (1965). *375 (c) Petitioner's Knowledge. -- Petitioner contends that he did not know how much his medical practice receipts were, that his checks did not "bounce" and that was all he needed to know. We do not believe petitioner's contentions. Petitioner's employees provided to petitioner up-to-date information about the North College Hill office medical practice receipts through the day sheets and the monthly summaries. From November 15, 1982, on, Zink provided essentially the same information about the Deer Park office medical practice receipts through the calendars. For several years, Weiss provided to petitioner monthly updates on overall taxable receipts (using the Anderson Bank deposits records) and on expenses of petitioner's medical practice and his farming activities. E.g., supra table 4. We do not believe that all these people went to this trouble merely because they liked to work with numbers. We believe, rather, that they went to this trouble because petitioner paid them to do so. We believe that petitioner paid them to keep track of his gross receipts and his medical practice receipts because petitioner wanted current information as to the profitability of his principal occupation *376 -- his medical practice. Tables 11 and 12, supra, clearly show that, for each of the 8 years before us, petitioner omitted to report substantial amounts of medical practice receipts. We are satisfied that those amounts are so large -- so consistently large -- that the omissions did not result from inadvertence. We are satisfied that petitioner was aware (1) of approximately the amount of his actual medical practice receipts each year, (2) that he was omitting substantial amounts of his receipts from what he reported on his tax returns, and (3) that these omissions substantially reduced his reported tax liabilities. Finally, there is the incident of the 1984 tax return. Using the subtraction method, Weiss came up with a negative figure for medical practice receipts. When Weiss informed petitioner and they discussed the matter, they agreed to put in an amount about 20 percent higher than the 1983 medical practice receipts amount. They used $ 280,000. The raid described in Houser I, 96 T.C. at 190-192, took place on August 28, 1985. About 6 days later, respondent's agents had come across the day sheets, id. at 192, which *377 ultimately were used in determining the deficiencies under the notice of deficiency. Id. at 194. The 1984 tax return was filed on November 12, 1985. If, as petitioner claims, he had not previously understood Weiss' subtraction method, then he surely understood it at that point. Nevertheless, petitioner did not give the day sheets or the monthly summaries to Weiss -- they would have shown Weiss that petitioner had North College Hill medical practice receipts of $ 310,219.47 (supra table 9) -- some $ 30,000 more than the total medical practice receipts amount sworn to on the tax return. Also, petitioner did not give the Deer Park office calendars to Weiss -- they would have shown Weiss an additional $ 22,171.73 of medical practice receipts. See supra tables 2 and 9. Finally, he did not give to Weiss the information that he also had $ 10,193 in medical practice receipts from the Ohio Bureau of Workers' Compensation. See supra table 9. Thus, even after Weiss brought his use of the subtraction method to petitioner's attention and the two of them were forced to focus on how this method led to an impossible result (i.e., negative medical practice *378 receipts), petitioner still withheld information from Weiss, and thereby caused omission from his receipts -- and from his taxable income -- of more than $ 60,000. See supra table 10. Petitioner testified at the trial, as respondent's first witness. (The Court had directed respondent's counsel to present his case-in-chief first.) Petitioner's counsel elected to confine his cross-examination to those matters raised in respondent's direct examination to petitioner. Nevertheless, when the time came to present petitioner's case-in-chief, petitioner did not testify. Thus, petitioner could have clarified how it came to be that petitioner filed a tax return showing less in medical practice receipts in 1984 than was shown on the day sheets alone, even though (1) Weiss had made it clear to petitioner that Weiss was using the subtraction method, (2) the subtraction method led to an impossible result, and (3) respondent's agents had already seen the day sheets. Petitioner's failure to testify in explanation of his discrepancy is additional evidence leading to our conclusion that petitioner had guilty knowledge. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), *379 affd. 162 F.2d 513 (10th Cir. 1947). (d) Failure of Communication. -- Petitioner protests that the omissions from income were a result of a failure of communications between himself and Weiss. We agree. But the failure was not because of petitioner's misunderstanding. We conclude that petitioner understood what was happening, and only Weiss misunderstood. Petitioner's incredible explanation (see Burrill v. Commissioner, 93 T.C. 643, 662 n.24 (1989)) is itself evidence of fraud. Boyett v. Commissioner, 204 F.2d at 208. (3) Conclusions
On his tax returns, petitioner substantially understated his medical practice receipts for 8 consecutive years. We do not believe petitioner's explanation that he provided to his tax return preparer direct information about all of his medical practice receipts. Petitioner paid for and received information showing that his medical practice receipts substantially exceeded what he reported on his tax returns. We conclude that petitioner understood and intended that his failure to deposit some of his receipts into the Anderson Bank account would result in *380 his tax return preparer's understating petitioner's taxable receipts on petitioner's tax returns. We conclude that respondent has shown by clear and convincing evidence that petitioner intended to evade his income taxes for each of the years 1977 through 1984, which taxes petitioner knew or believed he owed, by conduct intended to conceal this income. Accordingly, the statute of limitations does not bar respondent's assessment of deficiencies against petitioner for each of the years 1977 through 1983. Sec. 6501(c)(1). We hold for respondent on this issue. B. Extension Agreement Exception
As we have stated, petitioner pleaded the bar of the statute of limitations and proved that the notice of deficiency was mailed more than 3 years after the later of the tax return filing or the due date as to each of the years 1977 through 1983. Respondent pleaded in the alternative, as to 1982 and 1983, the exception of section 6501(c)(4), extension by agreement. In order to fall within this exception to the general period of limitations, respondent must prove by a preponderance of the evidence that (1) the parties consented in writing to extend the time for the assessment of the tax, *381 (2) the consent was signed before the expiration of the time prescribed by section 6501(a) to assess the tax, and (3) the notice of deficiency was issued before the expiration of the extension period agreed on. See Robinson v. Commissioner, 57 T.C. 735, 737 (1972), and cases cited therein. The parties executed an agreement to extend the period of limitations for 1982 on September 22, 1986, which was less than 3 years after petitioner filed his 1982 tax return. The parties executed an agreement to extend the period of limitations for 1983 on July 7, 1987, which was less than 3 years after petitioner filed his 1983 tax return. The agreement to extend the 1982 limitations period extended the period indefinitely. The agreement to extend the 1983 limitations period extended the period to June 30, 1988. The notice of deficiency was issued on April 20, 1988, before the expiration of time in each of the agreements. We conclude that respondent has shown by a preponderance of the evidence that the parties consented in writing to extend the time for the assessment of the tax, the consent was signed before the expiration of the time prescribed by section 6501(a) *382 to assess the tax, and the notice of deficiency was issued before the expiration of the period agreed on. Accordingly, the statute of limitations does not bar respondent's assessment of deficiencies against petitioner for 1982 and 1983. Sec. 6501(c)(4). We hold for respondent on this issue. II. Fraud Additions to Tax
A. Fifty-Percent Additions
In order to impose the 50-percent fraud addition to tax for any of the years 1977 through 1981, sec. 6653(b), [18] or for any of the later years before us, sec. 6653(b)(1), respondent must prove, by clear and convincing evidence, that petitioner has an underpayment of tax for that year, and that some part of that underpayment is due to fraud. Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried the burden of proof as to the 50-percent fraud addition to tax for each of the years 1977 through 1984. *383 We hold for respondent on this issue. B. Additional Amount for Portion Attributable to Fraud
The additional amount added to the tax under section 6653(b)(2) is equal to 50 percent of the interest payable under section 6601 and applies only to the portion of the underpayment that is attributable to fraud. After several modifications of position, see supra note 14, respondent contends that this additional amount applies to so much of the deficiency as is attributable to unreported medical practice receipts for 1982, 1983, and 1984. Respondent has the burden of proving by clear and convincing evidence what portion of the deficiency is attributable to fraud. Sec. 7454(a); Rule 142(b). [19]
*384 In part I.A.(1) of this opinion, we concluded that respondent proved by clear and convincing evidence that petitioner had an underpayment of tax due to unreported medical practice receipts for each of the years in issue. In part I.A.(2), we concluded that respondent proved by clear and convincing evidence that some part of that underpayment for each of the years in issue was due to fraud. In this part, we determine the amount of the underpayment of tax for each of the years 1982, 1983, and 1984 that resulted from fraud. We conclude, and we have found, that petitioner's medical practice receipts were in at least the amounts shown in table 9, supra. We conclude, and we have found, that petitioner omitted to report medical practice receipts in not less than the amounts shown in the right-hand column of table 10, supra. Our analysis in part I.A.(2), supra, leads us to conclude that all the amounts so omitted were omitted due to petitioner's fraud. We hold for respondent as to the day sheets medical practice receipts and the Ohio Bureau of Workers' Compensation medical practice receipts. We hold for respondent as to the Deer Park office medical practice receipts, but only *385 to the extent set forth in tables 2 and 9, supra; we hold for petitioner as to the remaining amounts that respondent asserted were Deer Park office medical practice receipts. [20]
III. Amounts of Deficiencies
In part I.A. of this opinion, respondent had the burden of proving by clear and convincing evidence that there were underpayments of tax, some part of which was due to fraud; respondent carried this burden. In part II.B. of this opinion, respondent had the burden of proving *386 by clear and convincing evidence the amounts of petitioner's underpayments of tax that were attributable to fraud; respondent carried this burden, but only in part. In this part of the opinion, petitioner has the burden of proving by a preponderance of the evidence that respondent erred in the notice of deficiency determinations as to matters of fact. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, respondent has the burden of proof with respect to the additional income tax deficiencies and additions to tax asserted in the second amendment to answer and the answer to amended petition. Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981). A. Medical Practice Receipts
We have set forth our findings as to the amounts and components of petitioner's medical practice receipts in table 9, supra. The day-sheet amounts (all determined in the notice of deficiency) and the Ohio Bureau of Workers' Compensation amounts (determined in the notice of deficiency for 1983 and 1984, and asserted in the answer to amended petition for 1977 through 1982) are amply supported by the record, including the parties' stipulations, *387 and are not seriously challenged by petitioner. The Calendars, Etc., column of table 9, supra, is derived differently. Respondent's determinations (calendar amounts) and assertions (extrapolations, asserted in the second amendment to answer) are shown in table 14. Table 14 Year
Total Amount
Source
1977
$ 23,208.00
Extrapolation
1978
23,208.00
do.
1979
23,208.00
do.
1980
23,208.00
do.
1981
23,208.00
do.
1982
23,208.00
Calendars $ 2,685;
Extrapolation $ 20,523
1983
23,205.50
Calendars $ 15,205.50;
Extrapolation $ 8,000
1984
22,171.73
Calendars
At the start of the trial, after respondent's counsel made his opening statement, the Court inquired about the basis for the extrapolations. Respondent's counsel replied that -- Those day sheets [for the North College Hill office] were complete for the taxable years 1977 through 1984. In the Deer Park office no day sheets were kept as I understand it, but for part of 1982, 1983, and 1984 income receipts from patients was listed on an appointment calendar book by one of Petitioner's employees. The amendment to answer is based on a monthly average that was determined from those actual records which *388 were in existence for 1982, 1983, and 1984 and extrapolated back to the earlier years because there was evidence in fact that there was a medical practice operated out of that office and patient traffic was if not equal to the later years for which we had records it was greater than those later years. The Court pointed out to respondent's counsel that, because the extrapolations from the calendars were not in the notice of deficiency, no presumption of correctness is attached to the extrapolations. Respondent's counsel stated that he was prepared to put on evidence. However, there is very little evidence directly on this point. In reaching our holdings, we have taken into account (1) the clear evidence that petitioner saw patients at the Deer Park office every Tuesday, (2) the clear evidence as to the amounts shown on the calendars for portions of the last 3 years in issue (supra table 1), (3) Zink's testimony that she began to see diet patients on Mondays, Wednesdays, and Thursdays in the late 1970's, and (4) petitioner's estimates as to what portion of his medical practice receipts were earned at the North College Hill office. We hold for respondent as to the day sheets *389 medical practice receipts and the Ohio Bureau of Workers' Compensation medical practice receipts. We hold for respondent as to the Deer Park office medical practice receipts, but only to the extent set forth in tables 2 and 9, supra; we hold for petitioner as to the remaining amounts that respondent asserted were Deer Park office medical practice receipts. B. Other Adjustments
We have found that petitioner omitted to report on his 1981 tax return $ 226 interest income that he received from Ellis Bank and Trust Co. in 1981. We have found that petitioner should have deducted $ 3,668 more in Keogh (H.R. 10) plan contributions for 1981, and $ 3,668 less for 1982. We have found that petitioner omitted to report on his 1982 tax return $ 300 of State income tax refund income that he received in 1982. In the notice of deficiency, respondent determined that petitioner had $ 9,012 additional interest income from U.S. Treasury notes for 1982; disallowed business medicine and drug expense deductions to the extent of $ 1,504 (supra note 8); disallowed business automobile transportation expenses deductions to the extent of $ 336.16; and had $ 6,839 additional interest income from *390 U.S. Treasury notes for 1984. Petitioner failed to carry his burden of proving that respondent erred as to any of these adjustments. We hold for respondent as to all of these adjustments. IV. Substantial Understatement of Liability
In the notice of deficiency, respondent determined that petitioner is liable for additions to tax under section 6661 for 1982, 1983, and 1984. In the second amendment to answer, respondent asserted increased deficiencies and corresponding increases in additions to tax under section 6661 for 1982 and 1983. In the answer to amended petition, respondent asserted increased deficiencies and corresponding increases in the addition to tax under section 6661 for 1982; also, respondent asserted that the addition to tax under section 6661 applies to the tax attributable to several 1982 adjustments that, in the notice of deficiency, respondent had excluded from the reach of this addition to tax. Respondent contends that petitioner did not act in good faith with respect to the preparation and filing of his tax returns for 1982, 1983, and 1984 because petitioner knowingly and intentionally filed false tax returns. Respondent further contends that petitioner *391 did not exhibit good faith in delegating to Weiss the duty of preparing petitioner's tax returns and in failing to examine those tax returns before they were filed. Respondent asserts that there was no abuse of discretion in respondent's refusal to waive the addition to tax. Petitioner concedes that his medical practice receipts were substantially understated, but contends that the understatement was the result of Weiss' use, unbeknown to petitioner, of the subtraction method to calculate petitioner's medical practice receipts. Petitioner contends that he acted in good faith with respect to the preparation and filing of his tax returns for 1982, 1983, and 1984 because he provided to Weiss all of the information necessary to prepare complete and accurate tax returns. Petitioner further contends that because he had provided Weiss with all necessary information and because Weiss was familiar with "virtually all aspects of * * * Petitioner's finances and taxes", it follows that petitioner had reasonable cause to rely on the accuracy of the tax returns prepared by Weiss. Petitioner concludes that it was an abuse of discretion for respondent not to have waived the additions to tax under *392 section 6661. We agree generally with respondent, but we agree with the result of petitioner's conclusion as to certain 1982 adjustments. Section 6661[21] imposes an addition to tax in the amount of 25 percent of any underpayment attributable to a substantial understatement of income tax. Sec. 6651(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000. Sec. 6661(b)(1)(A). Our findings of fact and holdings make it clear that petitioner has a substantial understatement for each of the years 1982, 1983, and 1984. The question before us, then, is whether the additions to tax should have been waived. *393 Section 6661(c) provides that the Secretary may waive all or part of the addition to tax under section 6661 if the taxpayer shows both that (1) there was a reasonable cause for the understatement, and (2) the taxpayer acted in good faith. If the taxpayer has satisfied both of these predicates of the statute and respondent nevertheless refuses to waive the addition to tax, then respondent's refusal is reviewable by this Court on an abuse-of-discretion basis. Mailman v. Commissioner, 91 T.C. 1079, 1082-1084 (1988); see Estate of Jung v. Commissioner, 101 T.C. 412, 449 (1993). That is, for petitioner to win on this issue it is not enough for us to conclude that we would have waived the addition to tax -- we would have to conclude that, in refusing to waive the addition to tax, respondent has exercised this discretion "arbitrarily, capriciously, or without sound basis in fact." Mailman v. Commissioner, 91 T.C. at 1084; see Estate of Jung v. Commissioner, 101 T.C. at 449; Capitol Federal Savings & Loan v. Commissioner, 96 T.C. 204, 213, 223 (1991). *394 (As pointed out supra note 21, in OBRA 89 this waiver provision was replaced by a reasonable cause exception, which now appears as section 6664(c)(1).) If we determine that either (1) there was not a reasonable cause for the understatement, or (2) petitioner did not act in good faith, then we do not reach the question of whether petitioner was entitled to a waiver, because the statutory predicate for consideration of a waiver has not been met. If we find that there was a reasonable cause for the understatement and that petitioner acted in good faith, then we must examine whether respondent's refusal to waive the addition to tax was (1) arbitrary, (2) capricious, or (3) without sound basis in fact. Petitioner has the burden of proof on each element of the additions to tax as determined in the notice of deficiency; respondent has the burden of proof on the additions to tax asserted in the second amendment to answer and the answer to amended petition. Rule 142(a); see Estate of Jung v. Commissioner, 101 T.C. at 448, and cases cited therein. In parts I and II, we concluded that petitioner's omissions of medical practice receipts, and the underpayments *395 of tax resulting therefrom, were due to fraud. Clearly, then, there was no reasonable cause for petitioner's understatements of tax, to the extent attributable to the omissions of medical practice receipts, nor did petitioner act in good faith. Thus, on the preponderance of the evidence, respondent is sustained in refusing to waive the section 6661 addition to tax to the extent attributable to the omissions of medical practice receipts. This result obtains both with respect to the determinations in the notice of deficiency and the assertions in respondent's pleadings, except to the extent that our findings as to the Deer Park office medical receipts are less than the amounts asserted by respondent in the second amendment to answer. In the notice of deficiency, respondent determined that the section 6661 addition to tax applied to the understatements of tax resulting from adjustments for interest income (1982 and 1983) and otherwise-unexplained previously agreed items (1983). Petitioner has failed to carry his burden of proof as to any element of the addition to tax with respect to these items. Respondent is sustained as to these items. In the notice of deficiency, respondent did *396 not determine that the section 6661 addition to tax applied to the understatement of tax for 1982 resulting from the adjustments for medicines and drugs expenses, contributions to a Keogh (H.R. 10) plan, auto expenses, and a State income tax refund. Respondent asserted the addition to tax as to these items in the answer to amended petition. Respondent has failed to carry the burden of proof as to any element of the addition to tax with respect to these items. See Estate of Jung v. Commissioner, 101 T.C. at 450. Respondent is not sustained as to these items. We hold for respondent on this issue, except that we hold for petitioner on this issue with respect to the 1982 adjustments for medicine and drug expenses, contributions to a Keogh (H.R. 10) plan, auto expenses, and a State income tax refund. To take account of the foregoing, [22]
*397 Decision will be entered under Rule 155. Footnotes
1. Kenneth R. Hughes represented petitioner in the instant case during the suppression motion proceedings resulting in our opinion in Houser v. Commissioner, 96 T.C. 184↩ (1991), hereinafter sometimes referred to as Houser I. Although Hughes participated in some of the preparation for the later trial on the merits, his illness precluded his actual participation in the later trial. Hughes has since died.
2. The substance of sec. 6653(b) as in effect for 1977 through 1981, and sec. 6653(b)(1) as in effect for 1982 through 1984, appears in secs. 6651(f) and 6663 of present law. The substance of sec. 6661 as in effect for the years in issue appears in secs. 6662 and 6664(c) of present law. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
1. Of the 1981 deficiency, $ 386 is self-employment taxes under ch. 2; the remainder of the 1981 deficiency, and the total deficiencies for the other years, are income taxes under ch. 1.↩
2. Apparently, respondent already had assessed an addition to tax of $ 282.33 under sec. 6651(a)(2) for 1982, and additions to tax of $ 2,205.41 and $ 1,718.24 under sec. 6651(a), pars. (1) and (2), respectively, for 1984. Respondent concedes that these additions to tax must be abated if the Court determines that petitioner is liable for any additions to tax under sec. 6653(b) with respect to the same underpayment. Sec. 6653(d)↩.
3. 50 percent of the interest due on $ 57,090.58↩
4. 50 percent of the interest due on the entire deficiency for each year.↩
1. See note 1 to the previous table of deficiencies.↩
2. See note 2 to the previous table of deficiencies.↩
3. 50 percent of the interest due on the entire deficiency for each year.↩
4. In the second amendment↩ to answer, respondent asserted increased amounts such that the deficiency for 1983 totaled $ 59,601.86, and the additions to tax were correspondingly increased. In the answer to amended petition, respondent stated that those amounts were incorrectly calculated and that the correct amounts are as stated in this table.
3. The hearing transcript and other evidence introduced in connection with petitioner's motion to suppress evidence are part of the record in the instant case. Our findings of fact made in connection with Houser I, 96 T.C. at 186-194, are hereby incorporated in our findings of fact in the instant report. Also, Rule 151(e)(3) provides, in pertinent part, as follows: RULE 151. BRIEFS * * * (e) Form and Content: All briefs shall contain the following in the order indicated: * * * (3) * * * In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact. In the instant case, the parties filed simultaneous briefs. In violation of Rule 151(e)(3), petitioner's answering brief does not include responses to respondent's proposed findings of fact. Under the circumstances, we have assumed that petitioner does not object to respondent's proposed findings of fact except to the extent that petitioner's proposed findings of fact are clearly inconsistent therewith. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. The Deer Park office is referred to as petitioner's residence in Houser I, 96 T.C. at 186↩.
5. The North College Hill office is referred to as petitioner's office in Houser I, 96 T.C. at 186↩.
6. The varying formats of the day sheets during 1977 through 1984 are described in detail in Houser I, 96 T.C. at 192-193↩.
1. This does not include $ 1,496 in capital gain distributions shown on Schedule B, part II.↩
2. For 1979, individual taxpayers were permitted to deduct 60 percent of long-term capital gain in arriving at gross income. Sec. 1202(a). Thus, only $ 598 of the $ 1,496 capital gain distributions appears on the Form 1040.↩
1. In the notice of deficiency, respondent determined that petitioner omitted $ 61,990.20 of medical practice receipts for 1984, and calculated the deficiency accordingly. Respondent has not asked for an increased deficiency for 1984, and so we will not enter decision for any greater amount than the deficiency amount determined in the notice of deficiency. Sec. 6214(a); Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), affd. 738 F.2d 67, 72↩ (2d Cir. 1984).
7. Under sec. 128(b)(1), no more than $ 1,000 was excludable by petitioner. Petitioner claimed his $ 1,000 exclusion on his 1982 tax return. The notice of deficiency appears to have the effect of allowing petitioner to exclude $ 2,000. We leave the parties as we find them on this matter.↩
8. Respondent calculated this adjustment as follows: ↩
Substantiated
$ 45,993 Less: Personal payments
(157)
Rebates
(1,413)
Allowable
44,423 Claimed
$ 45,927 Allowable
(44,423)
Adjustment
1,504 9. Sec. 6501 provides, in pertinent part, as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title [title 26, the Internal Revenue Code] shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed. -- (1) Early return. -- For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.↩
10. Sec. 6501(c) provides, in pertinent part, as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. -- (1) False return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. * * * (4) Extension by agreement. -- Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon.↩
11. Petitioner first raised the affirmative defense of the statute of limitations under sec. 6501(a) in the amended petition. Respondent's contentions with respect to the fraud and extension exceptions to the general period of limitations appear in the answer to amended petition. On answering brief, respondent also contends that for 1982 and 1983, the instant case falls within the exception to the general period of limitations set forth in sec. 6501(e), which provides for a 6-year limitations period for any taxable year in which gross income in the amount of 25 percent of the amount stated in the tax return is omitted from the tax return. Respondent did not raise the 6-year-period exception in a pleading, nor did respondent move a further amendment to answer to raise that defense. Rule 40. The 6-year-period exception was not tried by express or implied consent of the parties. Rule 41(b)(1). We will not consider the 6-year-period exception, raised for the first time on answering brief. E.g., Estate of Rosenberg v. Commissioner, 86 T.C. 980, 984 n.1 (1986), affd. without published opinion 812 F.2d 1401 (4th Cir. 1987); Markwardt v. Commissioner, 64 T.C. 989, 997-998 (1975); Molbreak v. Commissioner, 61 T.C. 382, 393 (1973), affd. 509 F.2d 616↩ (7th Cir. 1975).
12. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.↩
13. We have determined, supra, that the statute of limitations is not in issue for 1984. Nevertheless, we consider petitioner's 1984 actions at this point because any patterns established may have a bearing on our analysis of other years. E.g., Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100↩.
14. In the notice of deficiency, respondent alleges fraud with respect to petitioner's medical practice receipts for 1977 through 1984 and interest income from U.S. Treasury notes for 1982 and 1983. In the second amendment to answer and the answer to amended petition, respondent alleges fraud with respect to the entire deficiencies for 1977 through 1984. That is, in the second amendment to answer and the answer to amended petition, respondent alleges fraud with respect to (1) petitioner's medical practice receipts for 1977 through 1984, (2) interest income from U.S. Treasury notes for 1982 and 1983, (3) a State tax refund, a quantity purchase incentive, and a business expense deduction for 1982, (4) a casualty loss adjustment for 1979, (5) an interest income item for 1981, (6) miscellaneous adjustments for 1983, and (7) other adjustments to maximum tax computations. On brief, however, respondent alleges fraud only with respect to petitioner's medical practice receipts for 1977 through 1984. We take respondent's position on brief as, in effect, a concession by respondent that petitioner did not act fraudulently with respect to any of the adjustments other than the adjustments to petitioner's medical practice receipts. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Money v. Commissioner, 89 T.C. 46, 48↩ (1987).
15. At trial, a witness for respondent testified regarding a proceeding in which petitioner allegedly was prosecuted for theft of electricity and tampering with an electric meter. The asserted relevance of this testimony was to show that petitioner was very frugal, and that frugality was inconsistent with petitioner's contention that he failed to look at his tax returns for any of the years in issue. We struck the testimony on this subject. On opening brief, respondent asks us to reconsider this action. We have done so and come to the same conclusion as at trial. The evidence appears to be relevant within the broad definition of Fed. R. Evid. 401. However, the weight of the evidence is slight. Introduction of the evidence would require that petitioner have an adequate opportunity to explore (1) the facts underlying the charges and (2) the outcome of the alleged prosecution and the reasons for that outcome. Respondent then would have to be given an adequate opportunity to rebut petitioner's explanation. We concluded then, and affirm now, that the weight of any such evidence on our determination as to fraud in the instant case is slight. We conclude that, in the words of Fed. R. Evid. 403, the "probative value [of the proffered evidence] is substantially outweighed by * * * considerations of undue delay, [or] waste of time". See Laureys v. Commissioner, 92 T.C. 101, 127 (1989); Sundstrand Corp. v. Commissioner, 89 T.C. 810↩ (1987).
16. Petitioner's evasiveness and lack of specificity regarding the records of Deer Park office medical practice receipts are illustrated by the following: Q [Jordan] * * * You didn't really clarify what papers and journals you were talking about. At this time I would like you to explain what records you used to determine the profitability of your various businesses. A [Houser] * * * And he [Weiss] also had the monthly sheets on the -- from the North College Hill office and he also had the on the -- also would make tabulations on the -- on paper on the Deer Park office. So all of my income was reported to Mr. Weiss in this fashion. * * * Q [Wersching] And your discussions with Mr. Weiss would clearly reveal to him that this was an operating medical facility? A [Houser] Oh, of course, he had Donna's salary included and he had the income which was there on the thing that he was given every time and he had -- certainly he knew about it. * * * Q [Wersching] Did you ever show Mr. Weiss a record of patient receipts relating to your Deer Park practice? A [Houser] Oh, yes, they were -- in fact, if I didn't show them to him he would ask where are the Deer Park. So I'd show it to him and he'd tabulate or put it down on his notes. * * * Q [Wersching] If I remember correctly from this morning there was testimony regarding the specific documents that you gave Mr. Weiss when you met with him. If I remember correctly it included farm receipts. When Mr. Weiss -- so that we don't have an unclear picture as to what you gave him, when he came to your office what made up the documents that you handed him on a regular basis? A [Houser] The bank statements, the bank stubs, the workmen's compensation vouchers, the agriculture income if there was any, expenses, interest, 1099s, Deer Park -- figures on the Deer Park office, and that's -- such as that. * * * Q [Wersching] Did that include information regarding your medical practice income? A [Houser] Oh, yes. Yes, that included income from the Deer Park, income from North College Hill, the monthly sheets, the expenses. It would all be -- the industrial -- the workmen's compensation vouchers were all given to him.↩
17. Weiss testified by videotape deposition, some years before the trial in the instant case. It is clear that, at the time of the deposition, Weiss had some memory problems, chiefly as to dates. However, the Court was able to observe Weiss on the videotape and, in the context of the remainder of the record in the instant case, was able to come to useful conclusions as to the reliability of different parts of Weiss' testimony.↩
18. Sec. 6653(b) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) Additional amount for portion attributable to fraud. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax). For 1977 through 1981, the fraud addition to tax is provided for in sec. 6653(b), the first sentence of which is the same as the above-quoted sec. 6653(b)(1). Par. (2) was added by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, 616, and was effective for taxes the payment of which (determined without regard to any extension) is after Sept. 3, 1982. In the instant case, par. (2) is applicable to the additions to tax determined against petitioner for 1982 through 1984. The later amendments of this provision by sec. 1503 of the Tax Reform Act of 1986 (TRA 86 -- Pub. L. 99-514, 100 Stat. 2085, 2742), by sec. 1015(b)(2)(B) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3569), and by sec. 7721(a) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89 -- Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant case. As a result of OBRA 89, the revised fraud addition to tax now appears in secs. 6663 and 6651(f).↩
19. Sec. 1503(a) of TRA 86, 100 Stat. 2742, amended sec. 6653(b)(2) to provide as follows: SEC. 6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD. * * * (b) Fraud. -- * * * (2) Determination of portion attributable to fraud. -- If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes is not attributable to fraud. This amendment placed the burden of proof on the taxpayer to establish that a portion of the deficiency was not↩ attributable to fraud. The amendment applies to tax returns the due date of which is after Dec. 31, 1986, and so does not affect the instant case.
20. Between the notice of deficiency, the second amendment to answer, and the answer to amended petition, respondent determined or asserted that all of the underpayments of tax were due to fraud. As we indicated supra note 14, we concluded that respondent has conceded that petitioner did not act fraudulently with respect to any of the adjustments other than the adjustments to petitioner's medical practice receipts. This deemed concession is to be given effect in the Rule 155 computation of the additions to tax under sec. 6653(b)(2)↩.
21. Sec. 6661 provides, in pertinent part, as follows: SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY. (a) Addition to Tax. -- If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. (b) Definition and Special Rule. -- (1) Substantial understatement. -- (A) In general. -- For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000. * * * (2) Understatement. -- (A) In general. -- For purposes of paragraph (1), the term "understatement" means the excess of -- (i) the amount of the tax required to be shown on the return for the taxable year, over (ii) the amount of tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2)). * * * (c) Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith. The foregoing text reflects an amendment by sec. 714(h)(3) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 962, which took effect as if included in the TEFRA. The foregoing text also reflects an amendment by sec. 8002(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, which applies to penalties assessed after Oct. 21, 1986. Sec. 6661 was repealed by sec. 7721(c)(2) of OBRA 89, 103 Stat. 2399. The substance of former subsecs. (a) and (b) of sec. 6661 now appears in sec. 6662. The substance of former sec. 6661(c)↩ now appears in sec. 6664(c)(1), which eliminates the discretion element of the waiver, thus making the waiver into a reasonable cause exception. This change, applies to tax returns the due date of which is after Dec. 31, 1989, and so does not affect the instant case.
22. In the notice of deficiency, respondent made determinations as to maximum tax, minimum tax, and income averaging for several of the years. Petitioner did not assert error, so those determinations stand. However, our redeterminations may have arithmetic effects that would make one or another of these tax- modifying rules inapplicable. These matters are to be dealt with in the computations under Rule 155.↩